IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| GAVIN MICHAEL LIST, | ) | Case No. 1:25-cv-01996-JRA |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

## I.     Introduction

Plaintiff, Gavin Michael List ("List"), seeks judicial review of the final decision of the Commissioner of Social Security, denying his applications for child disability benefits ("CDB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act. This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the Administrative Law Judge ("ALJ") failed to adequately consider all medical opinions in the record and failed to include all relevant evidence in the record, I recommend that the Commissioner's final decision denying List's applications for CDB and SSI be vacated and that List's case be remanded.

## II.     Procedural History

List filed for CDB and SSI on March 24, 2023, alleging a disability onset date of his birth, December 30, 2002. (Tr. 188). The claims were denied initially and on reconsideration. (Tr. 62-63, 79-80). He then requested a hearing before an ALJ. (Tr. 121). List, represented by

counsel, and a vocational expert ("VE") testified before the ALJ on April 3, 2024. (Tr. 31-60).

At the hearing, the ALJ, List, and counsel, agreed to amend the disability onset date to July 22,

2022. (Tr. 56-57). On August 6, 2024, the ALJ issued a written decision amending the disability

onset date again to November 30, 2020, and finding List not disabled from that date on.[1] (Tr. 14-

30). The Appeals Council denied his request for review on July 21, 2025, making the hearing

decision the final decision of the Commissioner. (Tr. 1-3; see 20 C.F.R. §§ 404.955, 404.981).

List timely filed this action on September 19, 2025. (ECF Doc. 1). He asserts two

assignments of error:

> 1. The ALJ's residual capacity and step three findings are unsupported by substantial evidence. The ALJ failed to evaluate the medical opinion of Alivn [*sic*] E. House, Ph.D. The ALJ erred when failing to evaluate the prior administrative medical findings pursuant to the revised regulations.
>
> 2. The decision is unsupported by substantial evidence given that the ALJ cited medical records not contained in the current record and when relying upon the absence of important records identified at the hearing as absent from the record.

(ECF Doc. 8, p. 1).

## III.   Evidence

### A.   Personal, Educational, and Vocational Evidence

List was 17 years old on the amended alleged onset date, making him a younger

individual according to Agency regulations. (*See* Tr. 63, 15). He graduated from high school.

(Tr. 24). He has no past relevant work experience. (*Id.*).

---

[1] The Commissioner contends that the ALJ "inadvertently" identified the onset date as November 30, 2020, instead of the July 22, 2022, date agreed upon in the hearing, but the ALJ explains their reasoning for choosing this date. (ECF Doc. 9, p. 1; Tr. 15 ("Because CDBR benefits are payable only in adulthood, the earliest established onset date is the last day of the month before the month the claimant turns 18. Therefore, the CDB period of adjudication begins on November 30, 2020 (the last day of the month before he turned 18, on December 29, 2020).")).

### B.      Relevant Medical Evidence

On December 28, 2020, and January 4, 2021, Alvin E. House, Ph.D., conducted psychological assessments of List, who had turned 18 years old between the two examinations. (Tr. 316). Dr. House noted a history of autism spectrum disorder with associated attention-deficit hyperactivity disorder ("ADHD"), disruptive behavior, and anxiety symptoms. (Tr. 324). He diagnosed List with Asperger's Syndrome, ADHD, Combined Type, and Oppositional Defiant Disorder ("ODD"), the latter two in partial remission with medication, as well as a history of Anxiety Disorder. (*Id.*). Dr. House also noted that List had significant impairment in social relatedness, age-appropriate repertoire of skills and behavior, attention, and impulsivity, executive functioning, and emotional regulation. (*Id.*). He finally noted that List's intelligence, verbal learning, and memory, reading skills, and math skills were average or high average. (*Id.*).

On April 23, 2021, List attended an annual review conference for his individualized education plan ("IEP") with the El Paso-Gridley school system. (Tr. 327). The IEP was prepared by a team including Amber Buss, director of instruction, Toya Johnson, a counselor at Hammitt, Ashley Wilburn, a special education teacher, Susan Ineich, a supervisor at Hammitt, and Lisa Teplitz-Crawford, a speech therapist. (Tr. 360). The IEP notes that List can work independently, in small groups, or in whole class instruction, but that he can become anxious and disorderly if he does not understand or agree with the teacher. (Tr. 329). It also notes that List can become frustrated and defensive when corrected by a teacher. (*Id.*). The IEP further notes that List's behavior has improved over the course of the year, but he still occasionally speaks or acts inappropriately. (Tr. 330).

Under Educational Accommodations and Supports, List requires the following accommodations: a daily written schedule; consistent structure; advance notice of changes or

3

tests; frequent breaks and check-ins; preferential seating near the front of the classroom; space to stand, move about, or pace; the ability to return to the Special Education Classroom at will; simple language in directions; and instruction with additional, concrete examples. (Tr. 345-46). Further, when testing, List requires time and a half, note cards, and increased space. (Tr. 346-47). In the Behavior Intervention Plan, List is provided structured social interactions with peers in a small group discussion environment to learn how to appropriately insert himself into a conversation. (Tr. 355). In the Autism Considerations section, the IEP identifies List's further accommodations: all instructions must be both verbal and in writing; List may take breaks as needed and read books he is interested in; List is allowed to carry a water bottle and fidgets at all times; List is allowed time to walk in the morning and to talk about topics of his choosing; lighting and distractions in the classroom must be controlled; and changes to List's schedule should be limited where possible. (Tr. 358).

On January 5, 2023, List and his grandmother visited an urgent care facility run by Catalyst Life Services for a mental health assessment. (Tr. 427). Chanece Currie-Lawrence, LSW, noted his diagnoses of Autism, ADHD, ODD, and anxiety. (Tr. 444). For these, she noted his current prescriptions of Buspar, Focalin, Zoloft, and guanfacine, as well as heart medications. (Tr. 438). She also reported nutritional/eating pattern changes/disorders, depressed mood, anxiety, bereavement issues, anger/aggression, oppositional behaviors, inattention, impulsivity, and addictive behavior. (Tr. 436-37). She noted that List was cooperative but had paranoid thought content and flat affect. (Tr. 440, 441-42).

On February 8, 2023, List and his grandmother visited Catalyst Life Services for therapeutic behavioral services. (Tr. 446). Rhonda Lozier, QMHS, noted that List's symptoms had decreased but proposed referring him to the medical department to ensure he took his

4

medication. (Tr. 446-47). On February 16, 2023, List and his grandmother returned for another therapeutic behavioral services session, and Lozier noted increased motivation but flat affect throughout the meeting. (Tr. 448). On March 31, 2023, List and his grandmother visited Catalyst Life Services again for a psychiatric follow-up. (Tr. 452). Heather Stewart-Modic, PMHNP-BC, noted that his fund of knowledge was average and that his ADHD and anxiety were stable. (Tr. 455-56). He also received another prescription for Buspar, Focalin, Zoloft, and guanfacine. (Tr. 456).

On April 6, 2023, List saw his primary care provider, Nicholas Capaldo, M.D., at OhioHealth Physician Group Primary Care. (Tr. 468). Dr. Capaldo noted List's past Tetralogy of Fallot, which had been surgically repaired in 2011, as well as a heart murmur. (*Id.*). He also noted that Catalyst would be taking over management of List's psychological medications, and increased List's Zoloft dosage. (Tr. 469). Dr. Capaldo found List's mood and affect, behavior, thought content, and judgment to be normal. (Tr. 476).

On May 11, 2023, List and his grandmother returned to Catalyst Life Services for a psychiatric follow-up. (Tr. 503). List denied any depression, mania, uncontrolled anger, or panic attacks, and stated his anxiety and ADHD were controlled. (*Id.*). NP Stewart-Modic also noted that List's fund of knowledge was average. (Tr. 506). She also renewed List's prescriptions for Buspar, Focalin, Zoloft, and guanfacine. (Tr. 510).

On June 24, 2023, List underwent a consultative examination by Andrew Schneidemantel, D.O., with Summit Medical Exams. Dr. Schneidemantel found List's physical exam unremarkable and his mood, thought processes, memory, and concentration were appropriate. (Tr. 494-95). He diagnosed List with Autism, ADHD, anxiety, ODD, Tetralogy of Fallot, pulmonary stenosis, and decreased visual acuity. (Tr. 496).

On June 27, 2023, List and his grandmother visited Catalyst Life Services for an expert evaluation for continued guardianship by Dr. Panke. (Tr. 630). NP Stewart-Modic notes that List could not state what his medications were for or at what times to take them. (*Id.*). List also could not say how much standard items like housing or foods cost. (*Id.*). Dr. Panke noted that List had average demeanor and eye contact, and his speech was normal in all regards. (Tr. 631). List also presented normal gait, normal thought processes, and logical associations, and no abnormal or psychotic thoughts. (Tr. 632). Dr. Panke finally noted intact orientation, intact memory, intact attention, and concentration, above average fund of knowledge, and euthymic mood and affect, but recommended List continue in the guardianship of his grandmother. (Tr. 633-34). NP Stewart-Modic prescribed Buspar, Focalin, Zoloft, and guanfacine. (Tr. 634).

On September 19, 2023, List and his grandmother appeared for another psychiatric follow-up with NP Stewart-Modic at Catalyst Life Services. (Tr. 640). List stated that he has been unable to get his Focalin prescription, and his grandmother stated that his mood has improved because of that. (*Id.*). NP Stewart-Modic noted borderline fund of knowledge. (Tr. 642).

On October 6, 2023, List presented for his annual examination with his primary care provider Dr. Capaldo. (Tr. 557). Dr. Capaldo found that List was stable on his medication and that his cardiac MRI was normal. (*Id.*).

On January 2, 2024, List visited Catalyst Life Services for a psychiatric follow-up. (Tr. 649). NP Stewart-Modic ended his prescriptions of guanfacine and Focalin, renewed his prescriptions for Zoloft and Buspar, and newly prescribed him aripiprazole. (Tr. 652). List and his grandmother returned to Catalyst Life Services for a psychiatric follow-up on January 29, 2024. (Tr. 582). List stated that his conditions had improved since his last visit, that he was

6

feeling less irritable, and that he had begun working two days per week at Progress Industries, a vocational training program at Catalyst Life Services. (Tr. 582). NP Stewart-Modic newly prescribed List with Vyvanse and renewed his Zoloft, Buspar, and aripiprazole prescriptions. (Tr. 585). NP Stewart-Modic also noted that List's fund of knowledge was borderline. (Tr. 584).

On February 26, 2024, List and his grandmother visited Catalyst Life Services for a psychiatric follow-up. (Tr. 667). List's grandmother reported that his mood has improved, and List stated that he enjoys working. (*Id.*). NP Stewart-Modic noted that List's fund of knowledge is borderline. (Tr. 669). NP Stewart-Modic then continued List's prescriptions for Vyvanse, Zoloft, Buspar, and aripiprazole. (Tr. 670).

**C.       Medical Opinion Evidence**

**1.       State Agency Reviewing Opinion Evidence**

On July 15, 2023, state agency reviewing physician Diane Manos, M.D., opined that List could perform work at a light exertional level with no further limitations. State agency reviewing physician Leon Hughes, M.D., affirmed Dr. Manos's opinion on October 2, 2023. (Tr. 86).

On May 23, 2023, state agency reviewing psychologist Kristen Haskins, Psy.D., noted List had Autism Spectrum Disorder, Anxiety and Obsessive-Compulsive Disorders, and Attention Deficit/Hyperactivity Disorder. (Tr. 65). Dr. Haskins recommended a Mental RFC where List was capable of simple, repetitive tasks with simple one-to-three step instructions in a setting that does not have fast-paced demand and where he can work away from the distractions of others. (Tr. 68). Dr. Haskins also limited List to occasional, superficial interactions and found that List can adjust to minor changes in the work setting, but that major changes would need to be phased in. (Tr. 68-69). State agency reviewing psychologist Irma Johnston, Psy.D., affirmed Dr. Haskins' opinion on October 11, 2023. (Tr. 88).

### 2. Consultative Examiners

Following the consultative examination conducted June 24, 2023, Dr. Schneidemantel opined that List's physical examination was unremarkable, that he showed no acute distress, that his cardiovascular condition was appropriate aside from a murmur, that he had no problems with his neurologic cranial nerves nor cerebellar deficits, and that he had no issues during muscle strength or range of motion testing. (Tr. 495). Dr Schneidemantel's diagnosis of List consisted of the following: autism, ADHD, anxiety, ODD, Tetralogy of Fallot, pulmonary stenosis, and decreased visual acuity. (Tr. 496).

### 3. Medical Source Opinion Evidence

On December 28, 2020, Dr. House performed a clinical interview of List and administered the following tests: Hopkins Verbal Learning Test—Revised ("HVLT-R"); mental status examination; Wide Range Achievement Test, Fifth Edition ("WRAT-5"); Generalized Anxiety Disorder—7 Item ("GAD-7"); Ritvo Autism-Asperger's Diagnostic Scale—Revised ("RAADS-4"); Overall Anxiety Severity and Impairment Scale ("OASIS"); and Wechsler Adult Intelligence Test, Fourth Edition ("WAIS-IV"). (Tr. 316). On January 4, 2021, Dr. House conducted another clinical interview and the following tests: mental status examination; Beck Anxiety Inventory ("BAI"); Beck Depression Inventory ("BDI"); Current Symptoms Scale—Self-Report Form; and Goodman OCD questionnaire. (*Id.*). He also administered the following tests to List's grandmother: Adaptive Behavior Assessment System, Third Edition ("ABAS-3"); Behavior Report Form; Disruptive Behavior Rating Scale—Parent Form; and Home Situations Questionnaire. (*Id.*). He also reviewed data provided by List's grandmother from these sources: Easter Seals Autism Center, Interdisciplinary Evaluation, dated November 10, 2010; Brigance Screen Standardized Scoring Report, dated February 28, 2008; Present Levels of Academic

Achievement and Functional Performance, dated from 2015 to 2020; Functional Behavior Assessment, dated September 8, 2016; Hammitt School, Home-School Report, dated January-June 2016; and Educational Services Placement and Secondary Transition, both dated September 2, 2020. (*Id.*).

Dr. House noted that List was immature for his age but cooperative and compliant during testing. (Tr. 317). He was alert and fully oriented. (*Id.*) He correctly identified the date, month, year, and day of the week, correctly named the current and immediate former American presidents, and listed New York, Hollywood, Los Angeles, Miami, and Houston as five large American cities. (*Id.*). List was able to correctly repeat nine digits forwards and four digits backwards, and he could perform simple multiplication with a pen and paper. (*Id.*). His handwriting was legible, and he observed proper capitalization, spelling, and punctuation rules. (*Id.*). His concentration, memory, and general intellectual functioning were adequate, and his verbal fluency and oral comprehension were normal. (*Id.*). He answered appropriately when asked several hypotheticals: if he found a stamped, addressed letter on the sidewalk, List stated he would either place it in a mail pickup location or, if he could, return it to the person who had dropped it or to the mail slot where it was addressed; if he discovered a burst water pipe in his home, he would turn the water off and call a plumber; if he were stuck in the Denver airport with only one dollar, he would call his grandparents to arrange transport home. (*Id.*). List showed no indication of confusion, looseness of associations, or psychotic content, his affect was appropriate, his mood was unremarkable, and he was able to correctly complete the logical sequence 1A, 2B, 3C with 4D. (*Id.*).

List scored 104 on his WAIS-IV, putting him in the 61st percentile and indicating average intellectual functioning. (Tr. 318). He was high average in verbal comprehension,

average in perceptual reasoning and working memory, and low average in processing speed. (*Id.*). He also showed an above average score of word knowledge, a high average score on general fund of knowledge, and an average score on abstract verbal reasoning. (*Id.*). On his HVLT-R, List correctly recalled nine, ten, and twelve of twelve words over three learning trials and correctly recalled eleven on the delayed recall trial. (*Id.*). He recognized all twelve words without any false-positive errors for a high average total recall score. (*Id.*). His delayed recall, percentage of retention, and recognition discrimination index were all average. (*Id.*). On his WRAT-4, List had average scores in oral word reading and arithmetic and high average scores in sentence comprehension and reading composite. (Tr. 319).

List scored a one on his BDI and endorsed no high scores, suggesting no clinical depression in the past week. (*Id.*). He likewise scored a one on his OASIS questionnaire and his BAI, suggesting no anxiety disorder or excessive anxiety or tension in the past week. (*Id.*). List scored a three on his GAD-7 for the past two weeks, suggesting minimal anxiety symptoms, and endorsed being irritable or restless more than half the days of the past two weeks. (Tr. 319-320). List showed mild compulsive characteristics on the Goodman OCD scale for a score of one in both parts, which does not suggest obsessive-compulsive disorder for the past month. (Tr. 320). On his Current Symptoms Scale for ADHD and ODD, List endorsed six symptoms in the past six months related to ADHD: difficulty organizing tasks, being easily distracted, fidgeting, talking excessively, difficulty awaiting his turn, and interrupting or intruding on others. (*Id.*). He also endorsed one symptom in the past six months related to ODD, arguing, endorsed sometimes losing his temper, defying rules and requests, blaming others for mistakes or misbehavior, being irritable, and being angry or resentful. (*Id.*). List scored a 95 on his RAADS-R, well above the score of 65 that indicates autism spectrum disorder. (*Id.*).

10

List stated he did not use tobacco, alcohol, marijuana, or illicit substances. (*Id.*). He could not recall how long he had been prescribed his medications or what each of his medications was for. (Tr. 321). He stated he had been attending Hammitt after being suspended from his previous high school for his behavior. (*Id.*). He also stated that he would like to become a voice actor or game designer, which might require attending college, and that his only work experience was at a local library. (*Id.*).

Dr. House also interviewed List's grandmother, who sated that List had been diagnosed with autism when he was in second grade and had a history of pulling his hair out. (Tr. 322). She also reported that List exhibited frequent temper tantrums in public school, that he would dominate any conversation he had, and that he was bullied in school. (*Id.*). She also attested that he could not assess the social intentions or trustworthiness of others. (*Id.*). On a Current Symptoms Scale for ADHD and ODD, she endorsed fourteen of the eighteen symptoms of ADHD for the past six months, and she endorsed all eight symptoms of ODD for the past six months. (Tr. 323). She also endorsed bullying, threatening, or intimidating behavior for the past twelve months. (*Id.*). On her ABAS-3, she placed List at low average for the health and safety skill areas and at impaired in all others. (*Id.*).

Dr. House therefore concluded that List had Asperger's Syndrome, ADHD, ODD, and a history of Anxiety Disorder, with the latter three in remission with medication. (Tr. 324). He further stated that List's intelligence, verbal learning, memory, reading skills, and math skills were average or above, and that his perceptual motor skills were weak but not impaired. (*Id.*). Finally, he notes that List is significantly impaired in social relatedness, executive functioning, and emotional regulation, and that his pervasive developmental disability adversely affected his acquisition of age-appropriate skills and experiences. (*Id.*). Therefore, he recommended that List

11

continue in formal schooling with educational services and that his grandparents retain guardianship while List develops his ability to live independently. (Tr. 324-25).

On June 27, 2023, Dr. Panke evaluated List and found he had average demeanor, eye contact, and activity, and that his speech was normal. (Tr. 631). Dr. Panke also found that List's thought processes were normal, his associations were logical, and that he had no abnormal or psychotic thoughts. (Tr. 632). Dr. Panke finally found his orientation, memory, attention, and concentration intact and that his fund of knowledge was above average and his mood and affect euthymic. (Tr. 633-34). Dr. Panke then recommended that List remain in the guardianship of his grandmother. (Tr. 634).

### D.    Administrative Hearing Evidence

On April 3, 2024, List testified before the ALJ that he was born on December 30, 2002, and that he lived with his grandparents, who were his legal guardians. (Tr. 41). He stated that he works four hours per week with Catalyst Life Services. (*Id.*). He stated that he graduated high school and can read and write, and that he had been suspended several times from a previous high school for behavioral problems. (Tr. 42-43). List testified that he has issues with anger, and that he had almost punched a coworker who had insulted him a week prior. (Tr. 43). He stated that he gets annoyed when people purposely act incompetently or repeat themselves. (Tr. 44). List stated that outside his work, he does not interact with anyone besides his family, treatment providers, and a small group of friends that he plays video games with. (Tr. 44-45). He also stated that he occasionally gets into arguments with his grandfather over his behavior. (Tr. 45).

List testified that he feels physically and mentally drained at the end of his two-hour workdays folding baskets in a factory, but that he can perform other activities he enjoys for long periods of time. (Tr. 46). List then stated that he enjoys video games, reading, and taking care of

12

his cat. (Tr. 47). He testified that he has no issue waking up in the mornings, that he does not need reminders to take care of his cat, and that he is working on doing household chores without assistance from his grandparents. (Tr. 47-48). List also stated that he has a driver's license but does not drive and that he can prepare food in a microwave. (Tr. 48). He stated that he did not feel able to manage on his own without his grandparents because he would forget to take his medication. (Tr. 50). Finally, List stated that he can buy groceries on his own and that he takes care of his own hygiene because his grandparents take away his things if he does not. (Tr. 50-51). Under examination from his attorney, List stated that he could go to bed and wake up without reminders or assistance from his grandparents, and that he had handled his own finances with his grandfather's help. (Tr. 51-52).

After List's testimony concluded, the ALJ asked VE Marisia Hall to consider the jobs available for a hypothetical individual of List's age and education with no prior work experience and medium exertional limitations, who cannot climb ladders, ropes, or scaffolds or work at unprotected heights, can only perform simple tasks without production rate pace, can interact occasionally with others, and can adapt to occasional changes. (Tr. 53-54). The VE identified kitchen helper, DOT 318.687-010, hand packager, DOT 920.587-018, and cook helper, DOT 317.687-010, as available jobs for this individual. (Tr. 54). The VE further testified that if physical isolation were required, if the individual were off task more than ten percent of the time, or if the individual was absent more than once per month, all jobs would be precluded. (*Id.*). An individual who responds inappropriately to criticism from a supervisor or requires hourly supervision from a coworker or supervisor would also be precluded from all work. (Tr. 55). The VE stated that their job numbers were based on their education, training, and experience. (Tr. 56). List's attorney did not pose any questions to the VE. (*Id.*).

13

At the beginning of the hearing, List's counsel and the ALJ discussed amending the disability onset date from List's birth to July 22, 2022, the day after the close of his most recent denial of benefits. (Tr. 34). The ALJ also noted that some evidence from previous filings in 2021 and 2022 was appended to List's education records, but that it was not usual practice to include evidence from prior claims. (Tr. 34-35). List's counsel made no objection to the record but stated that he had requested additional documents for Exhibit 10F and 11F. (Tr. 34, 35). The ALJ then noted that Exhibit 11F, which consists of medical records from Catalyst Life Services, was missing several pages including an expert evaluation for continued guardianship by Dr. Panke. (Tr. 36). List's counsel stated that this may have been caused when the exhibits were renumbered, as Exhibit 11F had previously been numbered 16F, or when he had faxed the records in. (*Id.*). The ALJ also mentioned that she had not received any documents from List's vocational training program. (*Id.*). The ALJ then granted List's counsel two weeks to submit those missing records or to request an extension. (Tr. 38). At the end of the hearing, List agreed with the ALJ and counsel that the onset date would be amended to July 22, 2022, and the ALJ restated that List's counsel had two weeks to file additional evidence. (Tr. 57).

## IV.     The ALJ's Decision

In her decision dated August 6, 2024, the ALJ made the following findings:

1.     Born on December 30, 2002, the claimant had not attained age 22 as of November 30, 2020, the earliest potential onset date (20 CFR 404.102, 416.120 (c)(4) and 404.350(a)(5).

2.     The claimant has not engaged in substantial gainful activity since November 30, 2020, the potential onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.     The claimant has the following severe impairments: autism spectrum disorder; attention deficit hyperactivity disorder (ADHD); oppositional defiant disorder; anxiety disorder; and obesity (20 CFR 404.1520(c) and 416.920(c)).

14

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except the claimant cannot climb ladders, ropes, or scaffolds or work at unprotected heights. He can perform simple tasks without a production rate pace. The claimant can interact occasionally with others. He can adapt to occasional changes.

6.      The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on December 30, 2002 and was almost 18 years old, which is defined as a younger individual age 18-49, on the potential onset date (20 CFR 404.1563 and 416.963).

8.      The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968)

10.     Considering the claimant's age, education, work experience, and residual functioning capacity, there are jobs that exist in significant number in the national economy that the claimant can perform (20 CFR 404.1469, 404.1569a, 416.969, and 41.969a).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from December 30, 2002, through the date of this decision (20 CFR 404.350(a)(5), 414.1520(g) and 416.920(g)).

(Tr. 17-25).

## V.      Law & Analysis

### A.      Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits:

1.      whether the claimant is engaged in substantial gainful activity;

15

2.  if not, whether the claimant has a severe impairment or combination of impairments;

3.  if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4.  if not, whether the claimant can perform their past relevant work in light of his RFC; and

5.  if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

## B.  Standard of Review

This Court reviews the Commissioner's final decision to determine if it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d

16

at 241. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012); *see also Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 749 (6th Cir. 2007).

## VI. Discussion

### A. The ALJ committed reversible error by failing to mention Dr. House and the accommodations in the IEP, making the decision unreviewable.

List argues that the ALJ violated 20 C.F.R. § 404.1520c(b)(2) by failing to adequately discuss the evidence from Dr. House and the IEP. (ECF Doc. 8, p. 13). Further, the ALJ also failed to discuss the consistency between this evidence and the opinions of the state agency reviewing psychologists. (*Id.* at p. 20). Therefore, List argues that the ALJ's decision was not supported by substantial evidence in finding those PAMFs partially persuasive; because the VE

testified that the limitations in the PAMFs were job preclusive, List asks this court to vacate the denial of benefits. (*Id.* at pp. 20-21).

In response, the Commissioner cites district precedent which allows ALJs to forgo analysis of non-medical opinion evidence. (ECF Doc. 9 at p. 4) (citing *Quisenberry v. Comm'r of Soc. Sec.*, No. 17-2408, 757 F. App'x. 442 (6th Cir. 2018); *Workman v. Comm'r of Soc. Sec.*, No. 3:23-CV-01167, 2024 WL 2941180 (N.D. Ohio June 7, 2024), *report and recommendation adopted*, No. 3:23-CV-1167, 2024 WL 2873278 (N.D. Ohio June 7, 2024); *Baker v. Comm'r of Soc. Sec.*, No. 1:230CV-01988, 2024 WL 3091042 (N.D. Ohio June 21, 2024)). Further, the Commissioner contends that any error is harmless because the ALJ properly evaluated the PAMFs, and the RFC determination was supported by substantial evidence. (ECF Doc. 9 at p. 5).

As an initial matter, the Commissioner's post-hoc justifications for the ALJ's error are not well taken. *See Kauffman v. Comm'r of Soc. Sec.*, No. 1:25-CV-00886, 2026 WL 972348, at *4 (N.D. Ohio Apr. 10, 2026) ("[A] district court is not permitted to 'speculate[] what the ALJ may have concluded had he considered the medical evidence[.]'") (quoting *Harvey v. Comm'r of Soc. Sec.*, No. 16-3266, 2017 WL 4216585, at *7 (6th Cir. Mar. 6, 2017)). The Commissioner's cited precedent is distinguishable because the ALJ in each case first considered the medical source evidence, and then explained the reasoning for the disqualification of the evidence as a medical opinion. *See Quisenberry*, 757 F. App'x at 431 ("First, [the ALJ] noted that a doctor's 'statements that a claimant is "disabled" or "unable to work," or the like, are not medical opinions but are administrative findings dispositive of a case, which can never be entitled to controlling weight."); *Workman*, 2024 WL 2941180 at *7 ("The ALJ discussed Dr. Strobel's report but determined that it was 'not a medical opinion' because Dr. Strobel 'did not opine any limitations in the claimant's ability to perform work-related activities.'"); *Baker*, 2024 WL

18

3091042 at *10 ("[T]he ALJ adequately explained her consideration of the supportability and consistency factors and further indicated that she found the opinion only partially persuasive because it was 'vague in terms of the severity of these limitations.'").

Here, the ALJ never identified Dr. House by name, nor evaluated his opinion, despite referencing his clinical findings in the decision. (*See* Tr. 14-26; *see also* Tr. 316-25 (Dr. House's psychological assessment and opinion)). The ALJ cited from Dr. House was the scores of the IQ test he administered, which the ALJ identifies only as "his IQ scores in high school[.]" (*See* Tr. 18-19, 22). Likewise, the ALJ only cited the IEP for a description of List's disruptive behavior, but she did not mention the educational accommodations he was afforded. (*See* Tr. 21). The ALJ also did not address the consistency or supportability of the evidence from Dr. House or the IEP. (*See* Tr. 23-24). Because the ALJ did not expressly decide whether Dr. House's evidence or the IEP constituted medical opinions, that question is not properly before me.

Agency regulations require that ALJs weigh the supportability and consistency of all medical opinions in the record, or else explain why evidence from a medical source is not a medical opinion. 20 CFR § 404.1520c(b)(2); *Betty Jo M. v. Comm'r of Soc. Sec.*, No 1:23-CV-00367, 2024 WL 4052174, at *7 (S.D. Ohio Sept. 5, 2024). If the ALJ fails to explain their reasoning on the record, the Court cannot review the decision, and remand is necessary. *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

An apposite case is *Fleischer v. Astrue*, where the court found that the ALJ failed to adequately consider a medical opinion. 774 F. Supp. 2d at 881. The court remanded, stating, "In light of the fact that the VE found that a worker with the mental limitations suggested by Dr. Dietz would be unemployable, the Court cannot conclude that this error was harmless.

19

Ultimately, the Court finds that the omission prevents this Court from reviewing the ALJ's RFC determination, and necessitates reversal." *Id.* (citations omitted).

Here, Dr. House found "significant impairment" in List's social relatedness, age-appropriate skills and behavior, attention, and impulsivity, executive functioning, and emotional regulation. (Tr. 324). The IEP also identified List's educational accommodations, including the need for minimized environmental distractions, frequent breaks, and check-ins, the ability to move about, stand, and pace, and the ability to return to the Special Education classroom at will. (Tr. 345-46). At the oral hearing, the VE testified that requiring physical isolation or spending more than ten percent of time off-task would be work preclusive. (Tr. 54). Like in *Fleischer v. Astrue*, because the VE testimony suggests that the limitations and accommodations from Dr. House and the IEP are job-preclusive, the omission of the ALJ's consideration of this evidence is not harmless.

For the foregoing reasons, I recommend this case be remanded to the Commissioner to properly consider all medical opinions in the record.

### B.     The ALJ's decision cites to medical opinion evidence outside the record, preventing this Court from performing "meaningful judicial review."

List contends he was prejudiced when the ALJ improperly relied on evidence not found in the record to reach an adverse decision. (ECF Doc. 8 at p. 22; *see* Tr. 20-21).[2] The Commissioner acknowledges that the ALJ cites to evidence outside the record but argues that the error is harmless for two reasons. (ECF Doc. 9 at p. 6). First, the Commissioner contends that the evidence the ALJ intended to cite was from List's pre-hearing brief. (*Id.*). Therefore, the ALJ

---

[2] List also contends that the ALJ erred by not explaining her removal of at least five exhibits from a prior claim file, which presumably included the evidence at issue, but cites only to the non-binding Program Operations Manual System. (ECF Doc. 8 at p. 24); *see* POMS HA 01210.013. That cited manual describes when an ALJ might require evidence from a prior claim, but it does not require that the ALJ explain their decision to exclude evidence from a prior claim in the record. *See* POMS HA 01210.013.

had already viewed the evidence in the light most favorable to the claimant when denying

benefits, making the error harmless. (*Id.*). Second, the Commissioner states that the evidence

cited was merely subjective testimony which can be found elsewhere in the record. (*Id.*).

The ALJ has discretion in determining what evidence is relevant to the claimant's

medical record, but the attendant responsibility is that the ALJ must include all relevant medical

evidence in the record. *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir. 2010);

*Alvarez ex rel. J.A. v. Astrue*, No. 1:09-CV-00839, 2010 WL 3370396, at *4 (N.D. Ohio Aug. 25,

2010). When the ALJ relies on a piece of evidence in their decision but does not include it in the

claimant's record, the court must determine "whether the administrative record that does exist

permits meaningful judicial review." *Brady v. Apfel*, 41 F. Supp. 2d 659, 668 (E.D. Tex. 1999)

(citing *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 594 (1980)). If the missing evidence is

"immaterial or of *de minimis* value[,]" then the error is harmless. *Id.* However, if the missing

evidence renders judicial review impossible, then remand is required. *Anderson v. Astrue*, No.

3:11-CV-01536, 2012 WL 7110362, at *6 (N.D. Ohio Dec. 17, 2012), *report and*

*recommendation adopted sub nom. Anderson v. Comm'r of Soc. Sec.*, No. 3:11-CV-1536, 2013

WL 518711 (N.D. Ohio Feb. 12, 2013).

The Commissioner's arguments concede that the error was not harmless. By claiming

that the ALJ had taken the claimant's representations as true and had still ruled adversely, the

Commissioner admits that the ALJ relied on the missing evidence to decide the case. (*See id.* at

pp. 6-8). That alone establishes that the ALJ's decision is not reviewable, as this Court cannot

evaluate whether the ALJ's decision without seeing the evidence. *Mason v. Comm'r of Soc. Sec.*,

No. 1:07-CV-51, 2008 WL 1733181, at *11 (S.D. Ohio Apr. 14, 2008); *see also Hill v. Astrue*,

526 F. Supp. 2d 1223, 1228-29 (D. Kan. 2007) ("Given that the administrative record must

21

permit meaningful judicial review, and that the ALJ's findings were derived from information which the Commissioner failed to include in the record, the court cannot conduct the meticulous examination of the record required by law. Therefore, the case should be remanded[.]").

However, the Commissioner goes further and mischaracterizes the ALJ's improper citations as "merely to Plaintiff's subjective statements that he had difficulty in interpersonal communication and concentration[.]" (*Id.* at p. 6). While List's subjective testimony does make up part of the mis-cited passage, the immediately following paragraph details an examination by Theresa M. Regan, Ph.D., who examined List in late September 2021 and noted "emotional and behavioral dysregulation, rigid behavioral patterns and thinking, deficits in social reciprocity and nonverbal communication, lack of peer relationships, intense fixed interests and collections, and sensory processing differences." (Tr. 20-21). Neither this examination nor any other mentions of Dr. Regan appears anywhere else in the record. (*See* Tr. 30). Because this evidence was not contained within the medical record, it is unclear whether Dr. Regan also provided a medical opinion along with her examination results. (*See id.*). If it does contain opinion evidence, the ALJ also does not consider the supportability and consistency of Dr. Regan's opinion or weigh the consistency of the PAMFs against it. (*See* Tr. 23-24). More troubling, and as pointed out by the Commissioner, this mis-cited section appears to be lifted almost verbatim from the claimant's pre-hearing brief, inducing considerable doubt in the Court's mind that the ALJ had considered the cited records at all. (*Compare* Tr. 20-21, *with* Tr. 281).

As with the above recommendation, an ALJ's failure to articulate their consideration of relevant evidence frustrates this Court's review. For these reasons, I recommend this case be remanded to the Commissioner so the ALJ may include all relevant medical evidence in the

record, and that the supportability and consistency of any medical opinions therein be properly discussed.

      **C.**      **The claimant bears the burden of proving disability, and without a showing of good cause for the failure to produce documents, the ALJ may assume the record is complete.**

List contends that the culpability of the claimant's hearing attorney does not excuse the ALJ's duty to maintain a complete record. (ECF Doc. 8 at p. 23). He argues that the ALJ had actual knowledge that the record was missing notes from an examination by Dr. Panke and from List's vocational training program, and that she failed to make "every reasonable effort" to obtain that missing evidence per 20 C.F.R. § 404.1545(a)(3) and SSR 17-4p. (*Id.* at 25). In response, the Commissioner notes that List's hearing attorney failed to submit that evidence in a timely manner, and that without some good cause for that failure, the ALJ has discretion to close the record. (ECF Doc. 9 at 7).

The ALJ "will make every reasonable effort to help [the claimant] get medical evidence[.] 20 C.F.R. § 404.1512(b)(1). This duty exists regardless of whether the claimant is represented by counsel. *McCoy for McCoy v. Comm'r of Soc. Sec.*, No. 1:16-CV-1301, 2017 WL 3594568, at *9 (N.D. Ohio Aug. 18, 2017) (citing *Lashley v. Sec'y of Health & Hum. Servs.*, 708 F.2d 1048, 1051-52 (6th Cir. 1983)). However, the claimant ultimately bears the burden for providing a complete record. *Davidson v. Comm'r of Soc. Sec.*, No. 3:22-CV-00938, 2023 WL 4078203, at *12 (N.D. Ohio May 15, 2023), *report and recommendation adopted*, No. 3:22-CV-00938, 2023 WL 5948122 (N.D. Ohio Sept. 13, 2023). Where the claimant fails to submit records and does not show good cause for their inability to do so, the ALJ may assume that the record before them is complete. *Reidenbach v. Comm'r of Soc. Sec.*, No. 5:21-CV-1880, 2022

WL 3043060, at *10 (N.D. Ohio Aug. 2, 2022) (citing *Jackson v. Berryhill*, 268 F. Supp. 3d 115, 133 (D. D.C. 2017)).

While there is some disagreement on what constitutes good cause in the Northern District of Ohio, the minimum for a claimant represented by counsel is that (1) they demonstrate to the ALJ that their good faith efforts to obtain the records have been frustrated, and (2) they ask, or the ALJ offers, the ALJ's assistance in retrieving those records. *Davidson v. Comm'r of Soc. Sec.*, No. 3:22-CV-00938, 2023 WL 4078203, at *12 (N.D. Ohio May 15, 2023) (refusing to remand where the claimant did not show the frustration of good faith efforts to obtain the records and did not ask for the ALJ's help), *report and recommendation adopted*, No. 3:22-CV-938, 2023 WL 5948122 (N.D. Ohio Sept. 13, 2023); *Paige v. Comm'r of Soc. Sec.*, No 1:20-CV-1249, 2021 WL 2952811, at *7 (N.D. Ohio July 14, 2021) (refusing to remand where the claimant never mentioned the missing records to the ALJ); *Bourkhan v. Comm'r of Soc. Sec.*, No. 1:19-CV-1474, 2020 WL 4506725, at *5 (N.D. Ohio June 30, 2020) (granting a remand where the claimant informed the ALJ of a mental healthcare provider's unwillingness to produce requested documents and the ALJ's own request for those documents was also denied), *report and recommendation adopted*, No. 1:19-CV-1474, 2020 WL 4504897 (N.D. Ohio Aug. 5, 2020); *McCoy for McCoy v. Comm'r of Soc. Sec.*, No. 1:16-CV-1301, 2017 WL 3594568, at *10 (N.D. Ohio Aug. 18, 2017) (granting remand where claimant "appears to have done everything in her power to obtain the Charak Center records before requesting assistance from the ALJ").

At the beginning of the hearing, the ALJ, and the claimant's attorney agreed that the record was missing several items, including an unknown number of pages of records from Catalyst Life Services, an expert evaluation by Dr. Panke for continuing guardianship, and the notes from List's time at a vocational training program. (Tr. 35-36). The ALJ then agreed to

24

grant List's counsel two weeks to submit those documents or to request an extension. (Tr. 38). At the end of the hearing, the ALJ stated, "I have given [claimant's counsel] a couple weeks to get [the records] into the file. If he needs an extension it might be as much as a month. So when that evidence comes in or the time period expires, at that point I'll consider all the evidence and the testimony." (Tr. 57). Afterward, List's counsel submitted another copy of the Catalyst Life services records, which the ALJ attached as Exhibit 12F. (Tr. 14-15). List submitted no further evidence nor any requests for extensions. (Tr. 15).

List gives no reason at all for the hearing counsel's failure to submit those missing documents, merely stating "Plaintiff's hearing attorney submitted records post-hearing, but the records continued to be incomplete." (ECF Doc. 8 p. 24). Without a showing of the frustration of his reasonable efforts to complete the record, List cannot show good cause. Further, the List's counsel had no reason to believe that the ALJ would take any action to request the records herself. List's counsel did not ask the ALJ for assistance in acquiring those records, nor did the ALJ make any representations that she would take any action besides allowing two weeks for him to submit either the evidence or a request for an extension. (Tr. 38). Without a showing of good cause from List's counsel for the failure to submit evidence, the ALJ was justified in closing the record. *Reidenbach*, 2022 WL 3043060, at *10.

On this basis, I determine that the ALJ did not err by closing the record two weeks after the hearing when claimant's counsel failed to produce potentially relevant documents or request a timely extension. I therefore decline to recommend remand on this narrow issue.

## VII.    Recommendation

Because the ALJ failed to sufficiently assess all medical opinions in the record, and because errors in the record prevent this Court from fully reviewing the decision, I recommend

that the Commissioner's final decision denying List's applications for CDB and SSI be vacated

and that List's case be remanded under Sentence Four.


Dated: July 20, 2026

Reuben J. Sheperd
United States Magistrate Judge

_____

## OBJECTIONS

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C.§ 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

\* \* \*

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, \*2 (W.D. Ky. June 15, 2018) quoting *Howard*. The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).
under

26